**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **ROHAN DHRUVA,** *et al.*, for themselves and others similarly situated, | * | |
| | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. SAG-23-02265 |
| **CURIOSITYSTREAM INC.**, | * | JURY TRIAL DEMANDED |
| Defendant. | * | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Rohan Dhruva and Joshua Stern ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit brought against Defendant CuriosityStream Inc. ("Defendant" or "CuriosityStream") for violating the Video Privacy Protect Act ("VPPA") by collecting and sharing highly-specific and sensitive information about consumers' video consumption habits without their consent.

2. CuriosityStream develops, owns, and operates CuriosityStream.com, a streaming video platform broadcasting "the best documentaries on the planet."[1] CuriosityStream asks consumers "[w]hat [they] are curious about," and delivers them interesting, informative, and educational videos on a variety of subjects, including science, history, technology, nature, arts and society, and crime. As Congress has recognized, such "films are the intellectual vitamins that fuel

[1] CURIOSITY STREAM, https://curiositystream.com (last accessed 07/21/2023).

the growth of individual thought." S. Rep. No. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. at 10 (Aug. 3, 1988)). Indeed, the videos people watch can often reveal their private politics, religious views, or sexuality—in other words, their most personal and intimate details. *Id.*

3. The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

4. CuriosityStream violated the VPPA by knowingly disclosing personally identifiable information ("PII")—including a record of every documentary video consumed by Plaintiffs and Class members—to unrelated third parties without their consent. CuriosityStream installed computer code on its website, called the "Meta Tracking Pixel," which tracks and records Plaintiffs and Class members' private video consumption. Behind the scenes of the webpages that display videos—and unbeknownst to video viewers—this code collects Plaintiffs and Class members' video-watching history and discloses it to Meta Platforms, Inc. ("Meta" or "Facebook"). Meta, in turn, uses Plaintiffs and Class members' video consumption habits to deliver targeted advertisements to them.

## PARTIES

5. Plaintiff Rohan Dhruva is, and has been at all relevant times, a citizen of California, who resides in Santa Clara County.

6. Plaintiff Joshua Stern is, and has been at all relevant times, a citizen of California who resides in Riverside County.

7. Defendant CuriosityStream Inc. is a Delaware corporation with its principal place of business at 8484 Georgia Ave, Silver Spring, Maryland 20910. Defendant develops, owns, and operates CuriosityStream.com, which is used throughout California and the United States.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the VPPA). This Court also has supplemental jurisdiction over the California state claims because it arises from the same transactions and occurrences. This Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class and the California Subclass, and there is minimal diversity.

9. This Court has personal jurisdiction over Defendant because it is a Maryland corporation with its principal place of business in this state.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### A. The VPPA

11. The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, which was then published. With an eye toward the digital future, Congress responded by passing the VPPA. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

12. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18

U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

**B. The Meta Tracking Pixel**

13. Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[2] Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[5]

14. Meta owns facebook.com and generates revenue by selling advertising space on Facebook, and other applications it owns, like Instagram.[6]

15. Meta sells advertising space by highlighting its ability to target users.[7] Meta can target users so effectively because it surveils user activity both on and ***off its site***.[8] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests,"

---

[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html

[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[4] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[5] FACEBOOK, SIGN UP, https://www.facebook.com/

[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

"behavior," and "connections."[9] Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

16. Advertisers can also build "Custom Audiences."[11] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[14] One such Business Tool is the Meta Tracking Pixel.

17. The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[15] When the Meta Tracking Pixel captures an action, it sends a record to

---

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[12] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[15] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

Facebook. Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

18. Advertisers control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[16] Advertisers can also configure the Meta Tracking Pixel to track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17] An advertiser can also create their own tracking parameters by building a "custom event."[18]

19. Advertisers control how the Meta Tracking Pixel identifies visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[20] Pixel-specific Data includes "the Pixel ID and cookie."[21]

---

16 *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

17 FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

18 FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

19 FACEBOOK, META PIXEL, https://developers.facebook.com/docs/meta-pixel/.

20 *Id.*

21 *Id.*

**C. CuriosityStream and the Meta Pixel**

20. CuriosityStream.com hosts and delivers thousands of documentaries and educational videos in a variety of subjects, including science, history, technology, nature, arts and society, and crime. It asks its consumers what they are curious about and gives them streaming videos they can watch. *See* Figure 1.




**Figure 1**

21. Unknown to these consumers, however, CuriosityStream also passes users' video histories to Meta. And so, for many CuriosityStream consumers, what may have started out as movie night alone in the privacy of one's own home, with the Meta Tracking Pixel, has become a surprising public affair.

22. The CuriosityStream.com website hosts the Meta Tracking Pixel and transmits two distinct events to Meta. The first event is PageView. The second event is Microdata. PageView discloses a webpage's Universal Resource Locator ("URL"), along with whether a viewer has an account, to Meta.[22] If a CuriosityStream consumer uses CuriosityStream's search bar, that text is reflected in the website's URL, which, in turn is disclosed to Facebook. So if a CuriosityStream consumer is curious about "aliens on the moon," Meta knows the customer searched for "aliens on the moon."

[22] This data derives from a tool created and offered by Facebook.







**Figures 2 & 3**

23. Additionally, if a CuriosityStream consumer watches a particular video, that information is reflected in the webpage's URL as well. Each video on CuriosityStream.com has a unique number (ranging from one to four digits), which is disclosed to Meta through the PageView event.




**Figure 4**




**Figure 5**

24. Worse yet, the second Meta Tracking Pixel event—Microdata—discloses the video's title as well as the video description.




**Figure 6**

25. Both events, independently, permit an ordinary person to identify a video's content, title, and location.

26. When a visitor watches a video on CuriosityStream.com while logged into Facebook, Defendant compels a visitor's browser to transmit an identifying "computer cookie" to Meta called "c_user." The c_user cookie contains that visitor's unencrypted Facebook ID. When accessing one of the above videos, for example, Defendant compelled the browser to send cookies to Meta. Figures 7 through 9, below, show the c_user cookie being transmitted to facebook.com, as shown by the site's developer tools (accessed via a keyboard's F12 button).




**Figure 7**




**Figure 8**




**Figure 9**

27. The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID. A Facebook ID allows *anybody*—not just Facebook—to identify the individual CuriosityStream consumer with a Facebook account. If one types www.facebook.com/[FacebookID] a into web browser, it will load that individual's Facebook page. For example, the c_user cookie in Figures 7-9 is 1528550551, and www.facebook.com/1528550551 leads to the undersigned's Facebook page.

28. The Meta Tracking Pixel transmits additional cookies to Meta.

29. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[23] Facebook, at a minimum, uses the fr cookie to identify particular users.[24]

30. Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Facebook uses this for targeted advertising.

31. The Meta Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, CuriosityStream.com.[25] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[26]

32. Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

33. A Facebook ID is personally identifiable information. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of https://facebook.com.

34. Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, what CuriosityStream.com videos a user has requested and obtained.[27]

---

[23] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[24] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[25] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[26] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

[27] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

35. CuriosityStream begins to collect these parameters whenever a user first signs up for an account.




**Figure 10**

36. Defendant discloses these identifiers so Meta can match them with a corresponding Facebook profile and link it to a CuriosityStream consumer's subsequent activity on CuriosityStream.com.

37. By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos, CuriosityStream knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

38. Meta confirms that it matches activity on CuriosityStream.com with a CuriosityStream consumer's Facebook profile. Meta allows Facebook users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with

us about your interactions, such as visiting their apps or websites."[28] The off-site activity report confirms Meta identifies an individual's video viewing activities.




**Figure 11**

**D. Meta Captures This Information in Real-Time**

39. What is more, all these Meta Tracking Pixel custom events, parameters, and cookies are collected by Meta either while the internet communications are in transit or instantaneously as they are delivered, *i.e.*, while a particular webpage is loading. As shown on a web browser's developer tools, the Meta Tracking Pixels begins sending requests for information either while the consumer's browser is setting up a connection with CuriosityStream.com, and/or before the

[28] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?, https://www.facebook.com/help/2207256696182627. As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity." What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."

webpage completes loading. Figures 12 and 13 show facebook.com received information ***22.36 thousandths of a second*** after a CuriosityStream consumer typed "aliens on the moon" into the website's search bar and pressed "enter" to load the page showing the results.




**Figure 12**




**Figure 13**

40. In contrast, for this same webpage, it took the CuriosityStream consumer's browser ***28.35 thousandths of a second*** to establish a connection with CuriosityStream.com[29] and ***326.41 thousandths of a second*** to finish downloading the query results. Figures 14 and 15.




**Figure 14**




**Figure 15**

29 GOOGLE CHROME DEVELOPERS, TIMING BREAKDOWN PHASES EXPLAINED, https://developer.chrome.com/docs/devtools/network/reference/?utm_source=devtools#timing-explanation.

41. This shows that Meta was able to intercept the contents of a consumer's communication CuriosityStream while it was in transit to CuriosityStream.com or instantaneously as they are delivered.

**E. Experience of Plaintiffs**

Rohan Dhruva

42. On or around 2014, Plaintiff Rohan Dhruva created a Facebook account.

43. On January 2021, Plaintiff Dhruva created a CuriosityStream.com account and began paying for a subscription to watch videos on the website.

44. Since creating an account, Plaintiff Dhruva frequented CuriosityStream.com to watch documentary shows.

45. When Plaintiff Dhruva watched videos on CuriosityStream.com, Defendant disclosed his event data, which recorded and disclosed the video's title, URL, and video description to Meta. Alongside this event data, Defendant also disclosed identifiers for Plaintiff Dhruva, including the c_user and fr cookies to Meta.

46. By disclosing his event data and identifiers, Defendant disclosed Plaintiff Dhruva's personally identifiable information to a third-party, Meta.

47. Plaintiff Dhruva discovered that Defendant surreptitiously collected and transmitted his personally identifiable information in July 2023.

Joshua Stern

48. On or around 2007, Plaintiff Joshua Stern created a Facebook account.

49. On March 2020, Plaintiff Stern created a CuriosityStream.com account and began paying for a subscription to watch videos on the website.

50. Since creating an account, Plaintiff Stern frequented CuriosityStream.com to watch documentary shows.

51. When Plaintiff Stern watched videos on CuriosityStream.com, Defendant disclosed his event data, which recorded and disclosed the video's title, URL, and video description to Meta.

Alongside this event data, Defendant also disclosed identifiers for Plaintiff Stern, including the c_user and fr cookies to Meta.

52. By disclosing his event data and identifiers, Defendant disclosed Plaintiff Stern's personally identifiable information to a third-party, Meta.

53. Plaintiff Stern discovered that Defendant surreptitiously collected and transmitted his personally identifiable information in August 2023.

## CLASS ALLEGATIONS

54. **Class Definition**: Plaintiffs seek to represent a class of similarly situated individuals defined as all persons in the United States who have Facebook and CuriosityStream.com accounts, and viewed videos on CuriosityStream.com (the "Class").

55. **First California Subclass Definition**: Plaintiffs also seek to represent a class of similarly situated individuals defined as all Class members in the State of California (the "First California Subclass").

56. **Second California Subclass Definition**: Plaintiffs also seek to represent a class of similarly situated individuals defined as all Class members in the State of California who typed in any text content into the CuriosityStream.com search bar (the "Second California Subclass").

57. Subject to additional information obtained through further investigation and discovery, the above-described Class and Subclasses may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

58. **Numerosity (Fed. R. Civ. P. 23(a)(1))**: At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclasses. However, given the popularity of Defendant's website, the number of persons within the Class and Subclasses is believed to be so numerous that joinder of all members is impractical.

59. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and Subclasses that predominate over questions that may affect individual members of the Class and California Subclass include:

(a) whether Defendant collected Plaintiffs' and the Class's PII;

(b) whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly;

(d) whether Defendant disclosed Plaintiffs and the Class's PII without consent;

(e) whether Defendant's conduct violates California Civil Code § 1799.3;

(f) whether Defendant intentionally recorded Plaintiffs and the California Subclass members' communications under the California Invasion of Privacy Act ("CIPA"); and

(g) whether Plaintiffs and California Subclass members' search terms are the content under the California Invasion of Privacy Act.

60. **Typicality (Fed. R. Civ. P. 23(a)(3))**: Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class and Subclasses, used CuriosityStream.com to watch videos, had their PII collected and disclosed by Defendant, and had their communications recorded by Defendant, without their consent.

61. **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and CIPA. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the Class and Subclasses, and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class and Subclasses, additional claims as may be appropriate, or to amend the definition of the Class and Subclasses to address any steps that Defendant took.

62. **Superiority (Fed. R. Civ. P. 23(b)(3))**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class and Subclasses is impracticable. Even if every member of the Class and Subclasses could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class and Subclasses. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

63. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

64. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

65. Defendant is a "video tape service provider" because it creates, hosts, and delivers thousands of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). In particular, Defendant provides a library of audiovisual material for a monthly fee. Defendant also uses the videos to collect and disclose viewers' PII so it can later retarget them for advertisements.

66. Plaintiffs and members of the Class are "consumers" because they have accounts with CuriosityStream.com and pay to watch videos. 18 U.S.C. § 2710(a)(1).

67. Defendant disclosed to a third party, Meta, Plaintiffs and the Class members' personally identifiable information. Defendant utilized the Meta Tracking Pixel to compel Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook IDs, along with Plaintiffs' event data, like the title of the videos they viewed.

68. Plaintiffs and the Class members viewed videos using CuriosityStream.com.

69. Defendant knowingly disclosed Plaintiffs' PII because it used that data to build audiences on Meta and retarget them for its advertising campaigns.

70. Plaintiffs and Class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

71. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

72. On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**COUNT II**
**Violation of California Civil Code § 1799.3**

73. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

74. Plaintiffs bring this claim individually and on behalf of the members of the proposed First California Subclass against Defendant.

75. Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales … services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

76. Defendant is a "person providing video recording sales … services" because it sells access to its online video stream platform, CuriosityStream.com, which creates, hosts, and delivers thousands of videos on its website.

77. Defendant disclosed to a third party, Meta, Plaintiffs and First California Subclass members' personal information and the contents of their video records. Defendant utilized the Meta Tracking Pixel to compel Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' event data, like the title of the videos they viewed.

78. Plaintiffs and the First California Subclass members viewed videos using CuriosityStream.com.

79. Defendant willfully disclosed Plaintiffs' personal information and the contents of their video records because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

80. Plaintiffs and First California Subclass members did not provide Defendant with any form of consent—either written or otherwise—to disclose their personal information and the contents of their video records to third parties.

81. On behalf of themselves and the First California Subclass, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the First California Subclass by requiring Defendant to comply with Cal. Civ. Code § 1799.3's requirements for protecting a consumer's personal information and the contents of their video records; (iii) statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**COUNT III**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**

82. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

83. Plaintiffs bring this claim individually and on behalf of the members of the proposed Second California Subclass against Defendant.

84. To establish liability under section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> ***Aids, agrees with, employs, or conspires*** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

85. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA claim based on Meta's collection of consumers' Internet browsing history outside the https://facebook.com domain).

86. CuriosityStream has installed the Meta Tracking Pixel on its website, CuriosityStream.com.

87. The Meta Tracking Pixel is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

88. At all relevant times, by using the Meta Tracking Pixel, Meta intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiffs and Second California Subclass members.

89. In particular, the Meta Tracking Pixel recorded communications between CuriosityStream, on one hand, and Plaintiffs and Second California Subclass members, on the other hand, by collecting the search terms that Plaintiffs and Second California Subclass members entered. These were communications where CuriosityStream asked Plaintiffs and California Subclass members "What are you curious about?" and Plaintiffs and Second California Subclass members' responses were recorded in the URLs, which, in turn, were disclosed to Meta. *See* Figures 1-3.

90. At all relevant times, by using the Meta Tracking Pixel, Meta willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and putative Second California Subclass members, while the electronic communications were in transit or passing over any wire, line, or cable, or were being sent from or received at any place within California. *See* Figures 12-15.

91. Defendant CuriosityStream aided Meta, agreed with Meta, and conspired with Meta to intercept Plaintiffs and Second California Subclass members' communications by implementing the Meta Tracking Pixel to accomplish the wrongful conduct at issue here.

92. Plaintiffs and Second California Subclass members did not consent to any of Defendant or Meta's actions in implementing the Meta Tracking Pixel to intercept their electronic communications. Nor have Plaintiffs or Second California Subclass members consented to Defendant's intentional access, interception, reading, learning, recording, and collection of Plaintiffs and Second California Subclass members' electronic communications between themselves and CuriosityStream.

93. The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

94. Unless enjoined, Defendant will continue to commit the illegal acts alleged here. Plaintiffs continue to be at risk because they frequently use the search bar function on CuriosityStream to find videos on subjects they are curious about. Plaintiffs continue to desire to use CuriosityStream for that purpose but cannot without being unwillingly monitored by Defendant and Meta. Plaintiffs may or are likely to use the search bar function on CuriosityStream in the future.

95. Plaintiffs and Second California Subclass members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Class, and the First and Second California Subclasses under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs Dhruva and Stern as representatives of the Class and the California Subclasses, and naming Plaintiffs' attorneys as Class Counsel to represent the Class and the First and Second California Subclasses;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class and the First and Second California Subclasses on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 4, 2023 Respectfully Submitted

By: *_/s/ William N. Sinclair_*
William N. Sinclair (Bar No. 28833)
bsinclair@silvermanthompson.com
Silverman Thompson Slutkin & White, LLC
400 E. Pratt St., Suite 900
Baltimore, MD 21202
Telephone: (410) 385-2225
Facsimile: (410) 547-2432

By: *_/s/ Stefan Bogdanovich_*
L. Timothy Fisher (*pro hac vice*)
Neal J. Deckant (*pro hac vice*)
Stefan Bogdanovich (*pro hac vice*)
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
ndeckant@bursor.com
sbogdanovich@bursor.com

*Attorneys for Plaintiffs*